**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANJOLI JAGODA,<br><br>                              Plaintiff,<br><br>                    -against-<br><br>THE BOARD OF MANAGERS OF THE REGATTA CONDOMINIUM, RMR RESIDENTIAL REALTY, LLC, AMET "ALEX" VUCETOVIC, ANDREW J. MAGGIO, and NELSON CALDERON,<br><br>                              Defendants. | Case No.:<br><br><br><br>**COMPLAINT** |

Plaintiff Anjoli Jagoda, by and through her undersigned counsel, Lachtman Cohen P.C., brings this action against the defendants and alleges as follows:

## INTRODUCTION

***"There is nothing more important than a good, safe, secure home." – Rosalynn Carter***

1.      The Regatta Condominium in Mamaroneck is rife with misogyny.

2.      For most people, a home is a place of privacy, refuge and security; a safe haven to hideaway or escape life's challenges. Unfortunately, for many women like Anjoli Jagoda, it is not, as sexual harassment in housing is widespread.[1] And because of the unique discrimination that is faced at the intersection of sexism and racism, women of color like Ms. Jagoda are particularly susceptible to harassment.[2]

---

[1] The U.S. Department of Housing and Urban Development ("HUD") estimates that, in the United States, there are over two million instances of housing discrimination each year. *See Cityscape: A Journal of Policy Development and Research*, U.S. Department of Housing and Urban Development, Office of Policy Development and Research 37 (2015), https://www.huduser.gov/portal/periodicals/cityscpe/vol17num3/Cityscape_November_2015.pdf.

[2] *See* Kate Sablosky Elengold, *Clustered Bias*, 96 N.C. L. Rev. 457 (2018).

3.      In 2018, individuals made 1,956 complaints of sex-based discrimination in housing.[3] But these claims are a tiny fraction of the actual number because, most of the time, instances of sexual harassment in housing are not reported as victims are reluctant to come forward due to "fear of retaliation, silence as the chosen form of coping, aversion to the stigma attached to victims of sexual harassment, anticipation of ridicule, and a desire not to prolong suffering."[4]

4.      It takes great courage to speak up, but often times, those who do, like Ms. Jagoda, are not believed or even blamed for the harassment.[5]

5.      In addition, experiencing sexual harassment and threats of violence in the home is disturbing and devastating for the victim:

> [W]hen the harassment occurs in [one's] home, it is a complete invasion in [their] life. Ideally, home is the haven from the troubles of the day. When home is not a safe place, [an individual] may feel distressed and, often, immobile.[6]

6.      Finally, "[w]omen who are sexually harassed at work can retreat to their homes; women sexually harassed *at home* have *no* secure retreat."[7]

7.      Thus, as HUD recognized, sexual harassment interferes with a person's right to access and enjoy housing.[8]

---

[3] *See Defending Against Unprecedented Attacks on Housing: 2019 Fair Housing Trends Report*, National Fair Housing Alliance, at 16 (2019), https://nationalfairhousing.org/wp-content/uploads/2019/10/2019-Trends-Report.pdf.

[4] *See* Regina Cahan, Comment, *Home Is No Haven: An Analysis of Sexual Harassment in Housing*, 1987 Wis. L. Rev. 1061, 1067.

[5] *See id.* at 1068, 1074.

[6] Cahan, *supra*, at 1073. *See also Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act*, 81 Fed. Reg. 63,054, 63,055 (Sept. 14, 2016) (As HUD has recognized, "[o]ne's home is a place of privacy, security, and refuge (or should be)" and, therefore, "harassment that occurs in or around one's home can be" uniquely "intrusive, violative, and threatening."

[7] Deborah Dubroff, *Sexual Harassment, Fair Housing, and Remedies: Expanding Statutory Remedies into a Common Framework*, 19 T. JEFFERSON L. REV. 215, 222 (1997) (emphasis added). *See also* Cahan, *supra,* at 1073 (people who experience harassment at home cannot escape).

[8] 24 C.F.R. § 100.600(a)(2).

8.      Against this backdrop, the Regatta Condominium ("Regatta" or "Condominium")
is a condominium association of unit owners that was formed in 1998 pursuant to a Declaration of
Condominium filed and recorded, pursuant to N.Y. Real Property Law Article 9-B, in the Office
of the Westchester County Clerk. The Condominium is comprised of 114 residential units (13 of
which were initially sold as affordable housing), one commercial unit, and common elements, in
the building known as and located at 123 Mamaroneck Avenue in Mamaroneck ("Building").

9.      Overlooking the Mamaroneck River, the Regatta is across from Harbor Island Park,
playgrounds, picnic areas, sports fields, and a beach, and is steps away from shops, restaurants,
and entertainment in the heart of downtown Mamaroneck.

10.      On December 20, 2018, Ms. Jagoda purchased an apartment unit in the Regatta and
was looking forward to enjoying this lifestyle. She loves nature and was excited about moving into
her new home with a view of the water from her balcony. But little did she know that, when she
arrived, she would be forced to navigate a hostile housing environment and subjected to sexual
harassment, bullying, intimidation, and retaliation.

11.      Ms. Jagoda is a 34-year old woman of Sri Lankan descent. She is 5'1" and petite,
single, and lives alone.

12.      As soon as Ms. Jagoda moved in, she became the object of longtime Regatta
Building Supervisor Amet "Alex" Vucetovic's unwelcome and inappropriate touching, advances,
questions about her sex life, and attempts to turn Building-related discussions to sexual topics.

13.      Vucetovic's reputation for preying on women and engaging in coercive and
intimidating behavior is common knowledge and well-documented, as several women in the
Building have reported Vucetovic's misconduct, all to no avail. In fact, shortly after Ms. Jagoda
purchased her unit, her neighbors cautioned her to "be careful of the Super."

14.     In addition, Vucetovic – who, based on a records search, is not a licensed home improvement contractor in Westchester County (and is likely uninsured) – has a *de facto* monopoly on apartment renovation work in the Regatta. He zealously protects his turf and bullies any potential competition. And when a unit owner does not give Vucetovic apartment renovation business, or when Vucetovic overcharges for his work and is questioned by an owner like Ms. Jagoda, he retaliates viciously.

15.     As Regatta Board President Andrew Maggio told Ms. Jagoda, Vucetovic treats the Regatta "like his own personal fiefdom," as he has been empowered to by the Board and RMR. Vucetovic, in violation of the House Rules, freely breaks into apartments without permission and without knocking or announcing himself and gets away with whatever he pleases. As Board President Maggio told Ms. Jagoda: "What do you want me to do? Fire him and hire a Mexican who can't speak English?" The House Rules clearly do not apply to Vucetovic, who also lives in the Regatta. As Board President Maggio said: "It's hard to get someone to follow the rules when he's been doing what he wants for so long."

16.     In sum, as Vucetovic once said while intimidating and threatening Ms. Jagoda:

**"You own one unit, but *I* own the Building and the hallways in it, and if you keep acting this way, it's not going to end up well for you."**

17.     Moreover, at the Regatta, there is also a culture of bigotry. Vucetovic racially profiles guests of unit owners and complaints by other women show a pattern of Vucetovic preying on minorities. In addition, Board President Maggio has expressed his desire to get rid of owners of some of the Building's initially designated affordable housing units, who he calls the "Bronx bombers" and says they "don't know how to act."

18.     And when Ms. Jagoda's parents, who are from Sri Lanka and dark skinned, met Vucetovic for the first time, he greeted them with: "Welcome to America."

4

19.     The Regatta's Board of Managers, its managing agent (RMR), and Board President Maggio, condone Vucetovic's misconduct and protect and enable him. For example, they have campaigned against owners who complained about Vucetovic and wanted to serve on the Board. And on numerous occasions, when Ms. Jagoda reported Vucetovic to other members of the Board and RMR, Maggio admonished her to send her complaints to him only.

20.     Like other women at the Regatta, Ms. Jagoda was expected to tolerate the predatory culture without protest. Ms. Jagoda, however, was unwilling to stand by in silence, and over the course of 21 months, she notified the Board, Board President Maggio, other individual Board members, and RMR at least 20 times about Vucetovic's pervasive and severe misconduct, pleaded for help, and asked them to investigate and take action. But instead of protecting Ms. Jagoda and others, they ignored the Regatta's so-called "sexual harassment policy," did nothing, and dismissively told Ms. Jagoda that Vucetovic "has a hot head but would never do anything." On one occasion, Board President Maggio even asked Vucetovic to conduct a so-called "investigation" concerning an incident in which Vucetovic himself was the primary suspect.

21.     Making matters worse, when women speak up, they pay an even heavier price. And in Ms. Jagoda's case, the ongoing retaliation against her has been brutal, as Vucetovic continues to bully her for reporting his misconduct and rejecting his unwanted advances. For example, after Vucetovic was overheard calling Ms. Jagoda a "bitch," the word was scratched into the pillar next to her spot in the garage. Vucetovic also interferes with the delivery of packages to her unit.

22.     In addition, Vucetovic recently pulled up next to Ms. Jagoda in the parking garage, stared her down with a nasty look, and yelled something derogatory in his native language.

23.     On another occasion, while Ms. Jagoda was sitting on her balcony and Vucetovic was below in the courtyard, he stared her down with a nasty look and gave her the middle finger, and as she photographed him in the act, he barked:

**"Did you get that? Send it to your mom and tell her to shove it up her ass!"**



24.     The Board, Board President Maggio, and RMR have long been aware of the predatory culture that has permeated the Building and made its housing environment highly toxic, harmful, and demoralizing for women. Before Ms. Jagoda, several other cases of sexual harassment and other misconduct by Vucetovic were reported. But the Board's, Board President Maggio's, and RMR's condonation and ratification of discriminatory behavior – acts and omissions that expose powerless women to abuse because they enable men like Vucetovic who engage in such misconduct to do so without fear of punishment – have left Ms. Jagoda hopeless and prove that Vucetovic is considered not just indispensable, but *bulletproof*.

25.     For example, Board President Maggio trivialized Vucetovic's sexual harassment of Ms. Jagoda by saying: "He's just being a guy. At least he didn't slap your ass." On another occasion, he told her she should "just sleep with [Vucetovic] and get it over with."

26.     In addition, Ms. Jagoda's neighbor, a former Board president, once suggested that she pay Vucetovic to leave her alone. Ms. Jagoda also went to the Mamaroneck Police to file a report, but was discouraged after being told that Vucetovic "has a lot of friends in the Department."

27.     Apparently, at the Regatta, violence is considered a method of addressing unlawful conduct. One time when Ms. Jagoda and Board President Maggio were discussing Vucetovic's misconduct, he said: "I'll protect you. I can fight him. I have Roman blood in me because I'm Italian." Another time, when Ms. Jagoda complained about Regatta porter Nelson Calderon's inappropriate advances, Board President Maggio told her to "hire some guys to beat him up."

28.     Many female Regatta residents shared with Ms. Jagoda the similar experiences they had but declined to speak on the record because they fear retaliation.

29.     The impact of Ms. Jagoda's claims extends far beyond this case. Failing to hold the defendants accountable would set a dangerous precedent that will signal to the defendants and others who govern, manage, and work for housing developments that "anything goes" and that they are free to harass and marginalize women. This Court should not condone such a result.

## BASIS OF THE ALLEGATIONS

30.     Ms. Jagoda makes her allegations upon information and belief, except as to those concerning Ms. Jagoda and others, which are alleged upon personal knowledge. Ms. Jagoda's information and belief is based upon, among other things, the investigation conducted by Ms. Jagoda and her attorneys, including, without limitation, statements by current and former Regatta residents and a review of documents and information concerning the Regatta and the defendants.

## JURISDICTION AND VENUE

31.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law. This Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

32.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the acts or omissions giving rise to this action, including the unlawful conduct alleged herein, occurred in this District.

## PARTIES

33.     Plaintiff is an individual residing in Mamaroneck, New York.

34.     Defendant Board of Managers of the Regatta Condominium ("Board") consists of the nine elected members of the Regatta's Board of Managers. Pursuant to the By-Laws of the Regatta ("By-Laws"), the Board is charged with governing the Regatta's affairs by, among other things, enforcing the By-Laws and the Regatta's House Rules and Regulations ("House Rules").

35.     Defendant RMR Residential Realty, LLC ("RMR") is a New York State limited liability company with a principal place of business at 45 Knollwood Road, Suite 305, Elmsford, New York 10523. At all relevant times, RMR has served as the Regatta's managing agent. Pursuant to Article III, Section 11 of the By-Laws, the Board delegated to RMR several duties and responsibilities, including managing the Building's employees, and made RMR its alter-ego. At all relevant times, RMR acted by and through RMR Executive Vice President Wesley Woodlief.

36.     Amet "Alex" Vucetovic ("Vucetovic") is an individual residing in Mamaroneck, New York. He is currently, and at all relevant times has been, employed as the Regatta's Building Supervisor, and in this capacity, he supervises employees and is in a position of authority.

37.     Defendant Andrew J. Maggio ("Board President Maggio") is an individual residing in Mamaroneck, New York. He is currently, and at all relevant times has been, the President of the Board, and in this capacity, he supervises employees and is in a position of authority. Under Article IV, Section 5 of the By-Laws, he is considered "the chief executive officer of the Condominium."

38.     Defendant Nelson Calderon ("Calderon") is an individual residing in Mamaroneck, New York. He is currently, and at all relevant times has been, employed as the Regatta's porter.

## CONFIDENTIAL WITNESSES

39.     Several female Regatta unit owners, who have been living in the Regatta longer than Ms. Jagoda, shared their experiences concerning, among other things, Vucetovic's harassment and bullying, the Regatta's hostile housing environment and mistreatment of women and minorities, retaliation, and the Board's and RMR's failure to take action in response to their pleas for help and reports of misconduct. Each is designated as "CW__."

40.     CW1 is a woman of color in her 40's who, at all relevant times, has been subjected to sexual harassment, a hostile housing environment, bullying, and retaliation.

41.     CW2 is a Caucasian woman in her 50's who, at all relevant times, has been subjected to sexual harassment, a hostile housing environment, bullying, and retaliation.

42.     CW3 is a woman of color in her mid-30's who, at all relevant times, has been subjected to sexual harassment and a hostile housing environment.

43.     CW4 is a Caucasian woman in her early 50's who, at all relevant times, has owned a unit in the Regatta. CW4 rented her unit to a young woman who complained that Vucetovic sexually harassed and intimidated her.

## FACTUAL ALLEGATIONS

**A.    Ms. Jagoda is a Well-Rounded and Accomplished Individual**

44.    Ms. Jagoda is an accomplished and well-educated woman. She earned a B.A. in Economics and Psychology with a Minor in Business Administration from Boston University and a J.D./M.B.A. from Syracuse University's College of Law and Whitman School of Management.

45.    Ms. Jagoda is a Director of a Montessori School in Westchester County. A family business, Ms. Jagoda and her parents have dedicated their careers to creating safe and nurturing educational environments where young children can reach their full potential and experience the joy of learning. They are proud to have created a "home away from home" for countless students and their families in the communities they have served for over 45 years.

46.    In addition, Ms. Jagoda has always been dedicated to giving back to society. Several times a year, she works as a volunteer for a group that feeds the homeless outside The Bowery Mission in New York City.

**B.    Ms. Jagoda Was, and Continues to Be, a Victim of Sexual Harassment, Bullying, Intimidation, and the Regatta's Hostile Housing Environment**

*December 2018 – January 2019: The Harassment Begins*

47.    On December 20, 2018, Ms. Jagoda purchased an apartment in the Regatta.

48.    On December 26, 2018, Ms. Jagoda met Rafael Barajas, a home improvement contractor referred by her realtor, at the Building to discuss apartment renovations. After exiting the elevator and entering her floor, Vucetovic was there to greet them. Vucetovic knew Barajas and, in a hostile tone, asked what he was doing, as if marking his territory and protecting his turf from a competitor. Ms. Jagoda and Barajas walked away from Vucetovic. After they entered the apartment, Ms. Jagoda closed the door and locked it.

49.     While Ms. Jagoda and Barajas were meeting, Vucetovic – without knocking or announcing himself – broke into her locked apartment. Vucetovic, who is not a licensed home improvement contractor, barged in and started pitching work that *he* could do. Ms. Jagoda and Barajas stepped away and Barajas told her he got the sense that only Vucetovic does renovations in the Building; feeling uncomfortable, he left. With Barajas gone, Vucetovic pressured Ms. Jagoda and gave her a tour of units he claimed to have renovated. Each time, he did not knock or announce himself. Instead, he broke in with a credit card, making Ms. Jagoda uncomfortable.

50.     Each time Vucetovic breaks into a unit without permission, he violates Rule 20.5 of the House Rules, which provides:

> Board Member, RMR Residential Realty, LLC[,] Personal [sic] and Staff or other Unit Owners are not allowed to enter a Unit without being invited or given permission by the Unit Owner or Resident with the exception that the unit may be entered without permission in cases of emergencies.

> The building Staff is managed by RMR Residential Realty, LLC. No Board member except the Board President or Vice-President is authorized to direct the Building Staff on any issue. Any problems or issues that other Board Members, unit owners and renters have should be brought to the attention of RMR Residential Realty, LLC.

51.     Later that week, Ms. Jagoda brought her parents, who are from Sri Lanka and dark skinned like Ms. Jagoda, to the Building, as they wanted to meet Vucetovic after what had transpired. Vucetovic rudely greeted them by saying: "Welcome to America."

52.     Ms. Jagoda's parents had emigrated to the United States over 40 years ago.

53.     Vucetovic then broke into her neighbor's apartment to show Ms. Jagoda's parents his work. Notably, the neighbor later informed Ms. Jagoda that Vucetovic had not performed work in his unit and that he had not given Vucetovic permission to enter with guests.

54.     After Vucetovic made Ms. Jagoda feel like she had no choice, she reluctantly agreed to let him do the renovations.

55.     Notably, in Rule 11 of the House Rules, there is a stringent process for renovating apartments which requires Board approval and that the work be performed by licensed and insured contractors, with one unwritten exception: if the unlicensed Vucetovic does the work or the owner is friends with him, the owner can bypass the process. Ms. Jagoda is aware of at least four owners who bypassed the process because they are friends with Vucetovic or he performed the work.

56.     On December 31, 2018, when discussing the renovations, which included knocking down interior walls, Vucetovic asked Ms. Jagoda to select paint colors. Ms. Jagoda said she wanted pink, and Vucetovic proceeded to ask unwelcome questions about her sexual life: "You don't want any men to come in your bedroom?" Feeling uncomfortable, she said no. Vucetovic responded: "Are you a lesbian?" Ms. Jagoda said no.

57.     Ms. Jagoda told Vucetovic that she was going to be away on a trip to Sri Lanka with her family, leaving the evening of January 9 and returning on January 26. During that time, Vucetovic and his crew would perform the renovations.

58.     On January 9, 2019, Ms. Jagoda met Vucetovic to give him a mirror to hang in the entryway. Vucetovic, for no legitimate reason, asked her to come to the basement to put the mirror, that he could easily carry, in storage.

59.     Vucetovic led Ms. Jagoda to a desolate concrete room. Feeling nervous, she stayed at the doorway. He said, "come in, don't be scared," but she did not enter.

60.     After putting the mirror away, Vucetovic told Ms. Jagoda that he was going to walk her to her car in the garage despite the fact that she neither asked him nor wanted him to.

61.     Vucetovic followed Ms. Jagoda to her car but did not leave when they arrived. Instead, he watched her get in.

62.     After Ms. Jagoda was seated but before she could close the door, Vucetovic stepped in between her and the door, took her hand, held it, and said "don't go off and get married" while in Sri Lanka. He then took the hood of her jacket, placed it over her head, stared at her in a sexualized manner, smiled, and left. Each of Vucetovic's physical contacts, statements, and looks was unwanted and left Ms. Jagoda stunned and afraid.

63.     Making matters worse, Vucetovic called Ms. Jagoda that night and asked her to come back. He said he'd miss her and asked if her mother could go away and she could stay.

64.     Then, while Ms. Jagoda was away, she had to speak with Vucetovic about the renovations. Each time, after discussing them, he asked if she was alone – an unwanted attempt by Vucetovic to make the conversation sexual. Each time she said no, and he abruptly ended the call.

65.     When Ms. Jagoda returned, she was nervous about seeing Vucetovic, and when she did, he said: "You've been acting different. Did you meet someone in Sri Lanka?"

66.     Ms. Jagoda had just arrived at the Regatta, but she already felt afraid in her own home.

***February 2019: The Harassment Continues and Ms. Jagoda Reports it For the First Time***

67.     On the morning of February 4, 2019, Ms. Jagoda spoke to Vucetovic about the renovations, and he followed up to ask when she was having lunch. He said they should go to lunch and Ms. Jagoda politely responded that she doesn't usually take lunch breaks.

68.     Ms. Jagoda was very distressed. She did not know who at the Regatta to ask for help and who she could trust, if anyone, as Vucetovic was very comfortable acting inappropriately.

69.     Later that month, Ms. Jagoda asked Vucetovic to fix a toilet that was working before the renovations. He charged $400 for a Flushmate that he installed, but when she questioned it, because it did not cost anything as he took it from the Building's inventory, he screamed at her.

70.     And in response to her statement that the toilet worked before the renovations, he said, in a hostile tone: "That doesn't matter! It doesn't work now! I put the Flushmate in! Do you think it's free?"

71.     On February 21, 2019, Ms. Jagoda saw Vucetovic by the garage elevator. He was with Board President Maggio, who she was meeting for the first time. A man named Sabi, who worked for Ms. Jagoda's family, was with her. She asked Sabi to escort her because, after the incidents with Vucetovic, she was afraid to go alone.

72.     Vucetovic falsely told Board President Maggio that Ms. Jagoda was dating Sabi. She unequivocally denied it, but Vucetovic mocked and overruled her: "No, she *is* dating him." Board President Maggio and Vucetovic enjoyed a good laugh at Ms. Jagoda's expense.

73.     Moments after Ms. Jagoda and Sabi entered her apartment, there was a knock at the door. It was Vucetovic and Board President Maggio, who said he wanted to see Vucetovic's renovations. Ms. Jagoda did not want to let him in, but she was caught off guard. Board President Maggio entered and gave himself a full tour of the apartment. Without asking for permission, he entered her most private spaces, the bedroom and bathroom, in which she had personal items.

74.     On his way out, Board President Maggio looked at Sabi and, belittlingly, said: "Make sure [Ms. Jagoda's] Mommy and Daddy pay you for doing work here."

75.     On February 23, 2019, Ms. Jagoda had a call with Board President Maggio. He told her that: (i) another woman in the Building complained about Vucetovic "being flirty with her"; and (ii) Vucetovic "gets flirty" with housekeepers and had flirted with his housekeeper.

76.     Ms. Jagoda then reported the January 9 incident in the garage (¶¶ 58-63), but Board President Maggio trivialized it: "He's just being a guy. At least he didn't slap your ass."

77.     Ms. Jagoda then reported the incident when Vucetovic got aggressive about paying him for the Flushmate. Board President Maggio asked: "Did he use four letter words?" When Ms. Jagoda said no, he told her how much Vucetovic gets paid and said: "That's okay, he has a hot head. He doesn't get that much money so he needs compensation."

78.     Board President Maggio then told Ms. Jagoda about another female unit owner's complaint that Vucetovic had racially profiled her African American guests.

79.     Ms. Jagoda then told Board President Maggio that Vucetovic asked her to lunch, and he advised that as long as she doesn't figuratively "open the door," Vucetovic will get the message. Board President Maggio mentioned that Vucetovic sings at nightclubs, used to be a "rock star" in Albania, and still has a "rock star mentality about getting girls."

80.     Ms. Jagoda then asked Board President Maggio for permission to change the locks and put a chain lock on her door because she was scared to move in. He said she could.

81.     Ms. Jagoda then asked Board President Maggio about what checks and balances were in place to monitor Vucetovic's behavior, but he did not have an answer. Instead, he told her that, going forward, she could ask *him* for help – which proved to be insincere.

82.     Board President Maggio then asked Ms. Jagoda who knew about her problems with Vucetovic, and she said her realtor. Board President Maggio insisted he had to tell Vucetovic about her concerns. She said she was scared about Vucetovic retaliating, but he said he would only tell Vucetovic that another woman, not Ms. Jagoda, complained about his behavior.

### *March 2019: The Harassment and Intimidation Continues*

83.     On March 15, 2019, Vucetovic approached Ms. Jagoda in the garage and said: "You don't call me anymore." Feeling uncomfortable, she ignored him and walked away.

84.     A few days later, the harassment continued after Ms. Jagoda complained that Vucetovic overcharged her for plumbing work. Ms. Jagoda paid Vucetovic a lump sum for the renovations. Vucetovic, acting as general contractor, subcontracted the plumbing to Hudson Plumbing ("HP"), which does a lot of work in the Building. But in February, HP billed Ms. Jagoda's mother for all of the work despite the fact that Vucetovic, as GC, should have paid HP, so Ms. Jagoda asked HP for a breakdown of the bill. After reviewing it, she offered to pay HP for certain items (despite the fact that they were Vucetovic's responsibility), but HP threatened to put a lien on Ms. Jagoda's property if she did not pay the full amount. Ms. Jagoda then sent a letter to HP explaining the situation and advising how much she paid Vucetovic.

85.     On March 19, 2019, after Vucetovic found out, he yelled at Ms. Jagoda in the garage: "Do you have any problems?" Ms. Jagoda, scared, said no. He demanded to know why she sent the letter to HP and she explained that HP threatened to put a lien on her unit. Vucetovic also said that she should not have told HP what she paid him and that he was infuriated. Vucetovic then asked, condescendingly: "Do your parents not pay their bills either?"

86.     On March 22, 2019, Ms. Jagoda received a letter from RMR Executive Vice President Wesley Woodlief, alleging that "[t]here is ample evidence that trash and/or recycling waste from your unit is consistently not properly disposed." The letter claimed that "[t]his area is covered by the surveillance camera system and those violating the disposal rules will be fined."

87.     That day, Ms. Jagoda e-mailed Woodlief, refuting his baseless claims about the trash and advising him of "unpleasant circumstances" and an "unwelcome greeting" since she purchased her unit:

>   Since signing the papers for my apartment at the Regatta, there have been a number of unpleasant circumstances that have constituted quite an unwelcome greeting to the building. I have chosen not to complain to get along with others and try to deal with the issues myself. This letter does not help.

88.     The following day, Ms. Jagoda met with Board President Maggio at his law office on East Boston Post Road to further discuss her problems with Vucetovic. As she had already reported Vucetovic's December 2018–February 2019 misconduct to Board President Maggio (¶¶ 75-82), she reported the March 19 incident (¶ 85).

89.     Board President Maggio responded that another owner had complained about being overcharged by Vucetovic for renovations.

90.     Board President Maggio also told Ms. Jagoda that the Regatta was initially built as affordable housing and expressed his desire to get rid of the "Bronx bombers." According to Board President Maggio, several original owners are from the Bronx and "don't know how to act."

91.     Board President Maggio then told Ms. Jagoda about his high school's hockey team and laughed as he recounted how the coach told the players to "hit the opposing team with their purses because they're playing like a bunch of girls."

### *Neighbors Warn Ms. Jagoda to "Be Careful of the Super"*

92.     Vucetovic's reputation for making unwelcome sexual advances toward women and engaging in other harassing behavior was not a secret. Ms. Jagoda spoke with Richard and Enid Hammer, who live on her floor, and Mrs. Hammer warned her: "Be careful of the Super."

93.     A few days later, Ms. Jagoda's mother came to meet the Hammers because she wanted to find out if Ms. Jagoda could turn to them if she needed help. During the conversation in the Hammers' apartment, Mr. Hammer – a former Regatta Board President – said that none of the former Board Presidents left their key with Vucetovic because they did not trust him.

*April 2019: The Harassment Continues and*
*Board President Maggio Tells Ms. Jagoda About Other Victims*

94.　　On April 17, 2019, Board President Maggio told Ms. Jagoda that he once recommended to a "Spanish" female owner ("CW1") who he called "crazy" that Vucetovic help her with something in her apartment, but the woman rejected the recommendation and said "no, no, sexual harassment," and Vucetovic was not permitted to enter her unit without being accompanied by a female Board member. Board President Maggio laughed as he told the story.

95.　　Board President Maggio also said that Vucetovic treats the Regatta "like his own personal fiefdom."

96.　　On April 20, 2019, Ms. Jagoda's family came to visit. Her mother waited in the car in the garage while her father and brother went upstairs. On their way, they saw Vucetovic. Shortly thereafter, Ms. Jagoda got a call from Board President Maggio, who said she was allegedly seen on the security cameras "tracking dog poop in the elevator" and he asked if she did. The allegation was false, and she said no. While Ms. Jagoda's mother waited in the garage, she heard Vucetovic yell "that bitch got dog poop on the elevator" and that he was going to check the cameras. Board President Maggio later called Ms. Jagoda and said: "Don't worry, you're not in trouble."

*May 2019: The Harassment and Intimidation Continues and Board President Maggio Tells*
*Ms. Jagoda to "Just Sleep with [Vucetovic] and Get it Over With."*

97.　　On May 20, 2019, Board President Maggio called Ms. Jagoda. He told her that a female unit owner ("CW2") – who he called "crazy" – and her neighbor, Danny Amicucci, were running for the Board. He said he wanted to tell everyone at the annual meeting that he objected to CW2, that CW2 had "a vendetta" with Vucetovic, and that he had to make sure she was not on the Board. He later informed Ms. Jagoda that he wanted to stack the odds against CW2.

98.     On May 29, 2019, Ms. Jagoda met with Amicucci to find out what he would be like if he was elected. She asked if he was friends with Vucetovic, and he said no. She told him about her problems with Vucetovic – the sexual harassment and bullying and that she installed a deadbolt and chain lock on her door out of fear. She then asked Amicucci if he would feel comfortable disagreeing with Board President Maggio if he was on the Board, and he said that he would.

99.     Prior to being elected to the Board, Amicucci also met with CW1 and CW2 and, regarding Vucetovic, he gave each of them the sense that he was on the women's side.

100.    Amicucci then told Ms. Jagoda that he was in her unit when Vucetovic and his crew took down the wall in her kitchen and that Vucetovic used Amicucci's electrician. When Ms. Jagoda offered to show Amicucci her new bathroom, he told her that he had already seen it.

101.    On May 31, 2019, Vucetovic stopped Ms. Jagoda's deliverymen from bringing packages to her unit; he said they were not permitted to enter without insurance. The deliverymen laughed as the claim was false. While the deliverymen waited downstairs, Ms. Jagoda texted Board President Maggio a photo of the packages and called him to ask if Vucetovic's claim was true. After Board President Maggio called Vucetovic, the deliverymen were allowed to enter.

102.    Board President Maggio called Ms. Jagoda later that day and asked if she got the packages. He then joked that she should "just sleep with [Vucetovic] and get it over with."

### Vucetovic Threatens Ms. Jagoda and Warns Her: "I Own the Building and the Hallways in It"

103.    Later that day, Ms. Jagoda entered the elevator with Sabi from the garage to go upstairs. The elevator stopped at the first floor and Vucetovic was standing there. Ms. Jagoda quickly pressed DOOR CLOSE, but Vucetovic stuck his hand inside and forced the doors open.

104.    Vucetovic got into the elevator and inappropriately hugged Sabi, who was very uncomfortable. Ms. Jagoda asked Vucetovic to stop. Vucetovic then lost his temper and told Ms. Jagoda that *he* runs the Building. She responded that she is a unit owner.

105.    Vucetovic followed them to Ms. Jagoda's apartment. When they got to the door, Vucetovic got in Ms. Jagoda's face and said: "You own one unit, but I own the Building and the hallways in it, and if you keep acting this way, it's not going to end up well for you."

106.    Ms. Jagoda feared for her safety and asked Vucetovic to leave, but he refused and continued to intimidate Ms. Jagoda, who was shaking. As Vucetovic stared her down, she called Board President Maggio and reported the incident. He asked her to put Vucetovic on the phone. After speaking briefly with Board President Maggio, Vucetovic handed her the phone and left.

107.    Later, Board President Maggio called Ms. Jagoda and told her that there have been numerous complaints about Vucetovic and that he told Vucetovic to text her an apology.

108.    On May 31, 2019 at 9:15 p.m., Board President Maggio called Ms. Jagoda to talk about Vucetovic, who is Albanian. He said, "Albanians are primitive, tribal people" who "respond to hierarchy" and "just like a dog, Vucetovic needed that knock on the nose."

109.    Shortly thereafter, Ms. Jagoda ran into Board President Maggio in the garage. Again, they were talking about Vucetovic's harassment and bullying, and he said: "I'll protect you. I can fight him. I have Roman blood in me because I'm Italian."

### *June 2019: Ms. Jagoda and Other Women Report Vucetovic's Misconduct to Two Regatta Board Members and Officers: Susan Jansen and Bridget McGraw*

110.    On June 5, 2019 at 7:00 p.m., Ms. Jagoda met two other female residents at a workshop (in Vucetovic's office in the garage) about the Building's finances that Susan Jansen (Board Member and Treasurer) and Bridget McGraw (Board Member and Secretary) were conducting. They reported their experiences with Vucetovic and Jansen and McGraw listened.

111.    CW2 said Vucetovic was inappropriate with her and assigned her a parking spot number that has a sexual connotation (despite having other spot numbers to choose from) and made sexual jokes about it. She also said that Vucetovic became spiteful when she did not allow him to do renovations in her apartment and that he intimidated and bullied her. (Notably, the Board was already aware of CW2's complaints. CW2 told Ms. Jagoda after the workshop that she told the Board about Vucetovic, but they said they did not believe her.)

112.    McGraw asked questions and Ms. Jagoda reported some of her problems, including the January 9th incident and that Vucetovic broke into apartments. Jansen and McGraw expressed concerns. At one point, McGraw asked people to stop interrupting Ms. Jagoda so she could speak.

113.    Another owner ("CW3") reported that Vucetovic broke into her apartment while her daughter was alone inside. Vucetovic was supposed to do maintenance work for her, but instead of knocking and announcing his presence, he broke in while CW3 was out but her daughter was inside. CW3 said she was scared to speak up and that Vucetovic overcharged her for work.

114.    Jansen asked questions about Vucetovic breaking into apartments and seemed concerned about Vucetovic breaking into CW3's apartment while her daughter was alone.

115.    CW3 also reported incidents of sexual harassment. One time, she was walking down Mamaroneck Avenue and Vucetovic grabbed her shoulders from behind. She also saw Vucetovic ogling her and staring at her buttocks. She said Vucetovic often flirted with her and that it was not until Ms. Jagoda moved in that Vucetovic started to leave her alone.

116.    McGraw emailed Ms. Jagoda to thank her "for being brave enough to share what has happened with [Vucetovic]" and ask for a written statement. Ms. Jagoda said she needed to "proceed with caution" as residents warned that "it is futile to speak up because nothing happens." Ms. Jagoda said that she felt she would be "giving [Vucetovic] more of a reason to pick on me."

117. On June 6, 2019, Board President Maggio called Ms. Jagoda. He was upset and wanted to know what happened at the finance workshop and what she told Jansen and McGraw. He expressed concern that Vucetovic might get fired and said: "At least you're going to get what you want now. But no one else here knows how to turn on the boiler."

118. Board President Maggio then said he was going to tell the Board that Ms. Jagoda asked him not to tell the Board about the harassment, which would be a lie; that was completely false, as Ms. Jagoda never asked him to do that.

119. Board President Maggio even attempted to blame Ms. Jagoda for her own harassment. He asked if she had been in an abusive relationship (she has not), suggesting that if so, it might be why she is afraid of Vucetovic and that she is overreacting. He asked her this frivolous and insulting question on numerous occasions.

120. On June 9, 2019, Ms. Jagoda spoke to McGraw. She convinced Ms. Jagoda to speak to the Regatta's attorney, James W. Glatthaar ("Attorney Glatthaar"), and then contacted Board President Maggio to let him know that Ms. Jagoda was ready to speak with Attorney Glatthaar get his phone number.

121. On June 10, 2019, Ms. Jagoda spoke with McGraw. McGraw said the Board would not take any action against Vucetovic unless she provided a formal written statement. But Ms. Jagoda knew that she could not rely on McGraw's advice as Board President Maggio had told her that in the past, other unit owners came forward and submitted complaints about Vucetovic, ranging from sexual harassment to excessive charges for renovations, all to no avail.

122. On June 19, 2019, Board President Maggio texted Ms. Jagoda. She responded: "I need some space to process everything." When he finally got Ms. Jagoda on the phone, he said, in response to the above statement: "Do you use that line on your boyfriends?"

123.    Board President Maggio then grilled Ms. Jagoda and asked for a full recitation of her experiences with Vucetovic despite the fact that she had already reported them several times.

124.    Later that evening, the annual owners' meeting and election for the Board were held. Amicucci was elected to the Board. He was later appointed Vice President.

125.    At the meeting, Ms. Jagoda saw a fellow female unit owner ("CW4") who told her that a young woman to whom she had rented her apartment had complained that Vucetovic sexually harassed and intimidated her. Eventually, the tenant moved out.

126.    Also, at the meeting, there was controversy about Board President Maggio's right to serve on the Board and as President under the By-Laws as many claimed he is not a unit owner. Under Article III, Section 1, "all [Board] members shall be Owners of Units" (with certain exceptions that do not apply). Under Article IV, Section 1, "[a]ll officers must be Unit Owners or members of the Board of Managers."

127.    Several unit owners asked Board President Maggio for proof that his name is on the deed to his unit. Attorney Glatthaar was present and represented that he saw Board President Maggio's name on the deed, but he refused to show proof.

128.    In fact, Board President Maggio's name has *never* been on the deed to his unit. The deed, dated December 13, 2017, is, and has always been, in Board President Maggio's wife's name. Thus, Board President Maggio is currently, and has always been, improperly serving on the Board and as President in violation of the By-Laws.

### *July – October 2019: The Harassment Continues and Ms. Jagoda Reports It Several Times*

129.    On July 3, 2019, Ms. Jagoda was on her balcony with a female friend trying to enjoy a nice afternoon. From the Building's courtyard (also called the "plaza"), Vucetovic stared at her friend, making her uncomfortable.

130.    On July 10, 2019, the Building's porter, Nelson Calderon, approached Ms. Jagoda in the garage. He told her she is pretty and asked if she is single. He then told her that he is unhappy in his marriage and asked if she would date a married man. She said no.

131.    Calderon then asked Ms. Jagoda if she had seen the Building's new walkway. She said she did not and asked if it was nice. Calderon told her she could go see it and she said she thought it was closed for use by residents. Calderon then said that she could go because "no one follows that rule."

132.    Ms. Jagoda called Board President Maggio and reported the incident with Calderon.

133.    During a subsequent phone call, the issue with Calderon came up and Board President Maggio told Ms. Jagoda to "hire some guys to beat [Calderon] up."

134.    On July 10, 2019, Ms. Jagoda saw Amicucci, who is a licensed home improvement contractor, in the plaza with Vucetovic and other workers taking measurements. She asked Board President Maggio about it and he said Amicucci has been trying to get contracting business from the Building.

135.    During a separate call, Board President Maggio said that at Board meetings, Amicucci repeatedly asks to do contracting work for the Building. He told her that he had planned to give Amicucci some work.

136.    It became clear that Amicucci, a Board Member and Vice President, would not be adversarial with Vucetovic or Board President Maggio as they are the gatekeepers for getting construction business from the Regatta.

137.    On July 12, 2019, Ms. Jagoda sent an email to Board President Maggio, Jansen, and Woodlief stating:

I would like to formally request that there be sexual harassment training and a forthright discussion about boundaries with all maintenance workers at the Regatta. Included in this discussion should be a clear mandate that making advances on women in the building is strictly forbidden. I fear for my safety and am choosing to remain anonymous at this time, but I am reaching a point where I may have to give a statement. Please let me know when this conversation is had with the employees.

Employees of the Regatta feel empowered by their ability to get away with a wide array of things. Clear lines need to be drawn. After this is done, if those lines are crossed again, I will need to take action.

138.    Later that month, Board President Maggio called Ms. Jagoda and mentioned the women who have complained about Vucetovic. He then said that "no one would touch *them* with a 10-foot pole," but he could understand why the harassment would happen to Ms. Jagoda.

139.    Notably, on another occasion, when Ms. Jagoda saw Board President Maggio when she was walking in front of his law office on Boston Post Road, he told her that when he was younger, he "got a lot of girls" and that older ladies would hit on him. He told Ms. Jagoda about an encounter he had with an older lady and, as he did, he made a sexual up-and-down hand motion.

140.    On September 29, 2019, Board President Maggio was driving in the garage, pulled up next to Ms. Jagoda (who was walking) and stopped. He told her she looked different "in a good way," that her face "looked narrower" and she "looked good." Ms. Jagoda told him that she was dressed up because she went on a date earlier that day to the New York Botanical Garden in the Bronx. Board President Maggio told her to send him pictures from her date. She texted him a few pictures of the gardens only, none of herself.

141.    Board President Maggio then told Ms. Jagoda that he had something funny he wanted her to hear. It was a recording of a 911 call that CW2 made when she and Board President Maggio got into an argument earlier that month. He laughed as he played it.

142.    On October 2, 2019, Ms. Jagoda came home for lunch and saw Vucetovic in the garage. Twenty minutes later, someone put copies of two negative articles about CW2 under every door in the Building. The articles – at the top of which someone wrote "[CW2] apt. # ---" in bold – were published in community newspapers in one of New York City's outer boroughs that Regatta residents would not have seen but for this smear campaign.

### November-December 2019: The Harassment and Bullying Continues and Ms. Jagoda Reports It Several Times

143.    In November 2019, Board President Maggio called Ms. Jagoda. He said he ran into another female unit owner and asked if she knew her. She said yes and that she knew the woman had problems with Vucetovic. He quickly changed the subject.

144.    Ms. Jagoda sent a text message to McGraw and Board President Maggio, who then called Ms. Jagoda and expressed his displeasure with her including McGraw. Board President Maggio asked Ms. Jagoda if she was talking to McGraw and discouraged her from doing so. Notably, McGraw once told Ms. Jagoda that Board President Maggio "verbally abused her" in a chain of emails with other Board members.

145.    Board President Maggio also asked Ms. Jagoda if she talks to CW3, who had submitted a statement about Vucetovic sexually harassing her and breaking into her apartment.

146.    During Christmas, Ms. Jagoda gave a gift to a maintenance worker named Ari, who Board President Maggio calls "a dummy." Ms. Jagoda told Maggio that she was glad Ari was hired because he is a nice person. He responded: "Oh, you don't want him, he has a kid."

147.    During Christmas, Ms. Jagoda did not give gifts to Vucetovic or Calderon.

148.    On January 2, 2020, Ms. Jagoda went to her car and found "BITCH" – the word Vucetovic previously used to refer to Ms. Jagoda (¶ 96) – scratched into the pillar next to her spot:



149.    Feeling scared, Ms. Jagoda texted Board President Maggio this photo and he called her. She told him that she was concerned for her safety. Board President Maggio called her back and said he asked Vucetovic if he did it, and he denied it. He said he believed Vucetovic.

150.    Instead of conducting an independent investigation, Board President Maggio asked Vucetovic himself to conduct the investigation and check the security camera footage. Based on Vucetovic's word alone, the matter was dismissed.

151.    That same day, Board President Maggio called Ms. Jagoda as she was pulling into the garage, to ask if his housekeeper could use her parking spot. This request was strange. At the time, the garage was nearly empty, and his housekeeper could have parked in any spot, yet he picked the one with "BITCH" scratched into the pillar next to it. This made no sense. Ms. Jagoda, concerned about Board President Maggio's true motive for calling her, told him that she was going to file a police report.

152.    Ms. Jagoda called the Mamaroneck Police Department. The responding officer asked her about this incident and others, but he was dismissive.

153.    A few days later, Ms. Jagoda went to the Mamaroneck Police Department. An officer told her that when she had the courage, she could give a statement. He said another woman in the Regatta had complained about Vucetovic and they were "keeping an eye on the situation."

154.    Ms. Jagoda then spoke on the phone with Mr. Hammer, a former Board president, about what happened, and he suggested that she pay Vucetovic to leave her alone.

155.    Ms. Jagoda then texted Board President Maggio and McGraw to ask for permission to attend the upcoming monthly Board meeting to discuss her grievances with Vucetovic. Board President Maggio objected – on the grounds that having owners speak at Board meetings is too time-consuming – and said that she could only e-mail her grievance.

156.    In response to the objection, McGraw sent an e-mail to the other Board members, who agreed to hear Ms. Jagoda at the meeting. Board President Maggio then insisted that Ms. Jagoda had to send an e-mail detailing her grievances before she could be heard.

157.    That evening, Ms. Jagoda spoke with McGraw, who said that she was "in charge of" sexual harassment complaints against Vucetovic. Ms. Jagoda said that she did not know who she could trust. McGraw also told Ms. Jagoda that she had suggested posting contact information for people who had complaints of sexual harassment in the Building for residents to see but the Board did not want to advertise this out of fear that it would encourage others to come forward and complain about Vucetovic.

158.    McGraw then recommended that Ms. Jagoda get a dog as a form of protection because Vucetovic is afraid of dogs.

159.    McGraw also said that she reviewed the complaints that have been made against Vucetovic and noticed a pattern of Vucetovic preying on women and minorities.

160.    On January 10, 2020, Ms. Jagoda sent a lengthy e-mail to the Board – Board President Maggio, Dominick Ruggiero, Stephen Israelsky, Bridget McGraw, Anthony Villa, and Susan Jansen – detailing her grievance in order to be allowed to speak at the Board meeting:

I am writing this e-mail as per [Board President Maggio's] request that I submit a letter detailing my concerns before being allowed to speak with The Board. I have been an owner at the Regatta since December 2018. From the first day I stepped onto my hallway floor as an owner, I have been harassed by Alex Vucetovic. I will never forget being treated in a rude and hostile manner, as though I were an intruder on the floor of my own apartment unit that I paid a large sum to acquire. No new owner at the Regatta should be "welcomed" in that way. Now, over a year later, I will not tolerate any further instances of harassment or intimidation. I have the right to live in my place of residence in peace.

The Board has a fiduciary duty to victims at the Regatta, but a conflict of interest arises due to the close nature of the relationship that Alex has formed with some members of the Board.

On January 2nd, I noticed the word "BITCH" scratched into the garage pillar on the side of the pillar facing my parking spot. I see it every time I get out of my car. This was done on or after January 1, because I look at that side of the pillar every time I park and get out of my car, and I had not seen it prior to Jan. 1.

When I informed Andrew Maggio of the vandalism, he asked Alex to check the footage. The fact that he asked the person he knew was responsible for harassing and intimidating me to check the footage shows that: 1) I can no longer go to him as a primary point of contact with regard to harassment/intimidation; 2) there needs to be an impartial party/committee to whom these incidents can be reported and who will take action to appropriately address the situation; and 3) if something were to happen to me at the hands of Alex or someone willing to do his bidding, and surveillance cameras caught the footage, Alex would be able to erase the footage.

I have made a police report documenting this incident, and going forward I will call the police anytime I am further made to feel uncomfortable in the place that I live. Given the many things that have happened to me, every new incident that may seem trivial to others is a new item on a long list of harassment and intimidation that causes me great concern.

**Members of the Board have told me that Alex would not harm me, but they have not been on the receiving end of his threats or verbal aggression. I have provided members of my family with a list of dates and descriptions of the many occasions of intimidation and harassment. The document also includes which members of the Board I have discussed matters with and witnesses to a number of the events that happened to me. <u>If anything happens to me, my family has what they need to hold all parties involved responsible.</u>**

The Board of the Regatta is doing many things to help the building recuperate financially and structurally, and it would be sad for all of that work to be eclipsed by a legacy of essentially aiding and abetting harassment and intimidation of multiple females who live in this building. Bad publicity caused by legal action would tarnish the reputation of the Regatta and the Board.

I am requesting a meeting with the Board to reach a solution to this problem before I pursue remedies that do not involve a collaborative solution. Face to face meetings foster productive and cooperative dynamics whereby a solution can be reached. Letters back and forth are impersonal and will only escalate the issue at hand.

Please also inform me when the derogatory word will be painted over, so that I will know when not to be around in order to avoid Nelson. His inappropriate comments prompted my e-mail to the Board regarding sexual harassment training. Knowing Nelson's nature and his reputation at the Regatta, I believe Alex put Nelson up to this in order to bring my credibility into question and to make sure I couldn't go to Nelson for any help I may need. [Emphasis added.]

161.    Board President Maggio replied to Ms. Jagoda, copying Attorney Glatthaar and Woodlief, stating: "Thank you for your email. A response and meeting will be forthcoming."

### *January 2020 Board Meeting*

162.    Ms. Jagoda arrived for the Board meeting and saw what looked like a parking garage camera on the table and a sign that said "smile, you're on camera."

163.    The following Board members were present: Board President Maggio, Paolo Strino, Bridget McGraw, Susan Jansen, Dominick Ruggiero, Danny Amicucci, and Anthony Villa. Ms. Jagoda's mother attended as well. When she walked in, another gentleman who she did not recognize was present.

164.    Ms. Jagoda asked the members of the Board if they read her e-mail. No one responded, and Ms. Jagoda waited until they did. Finally, Amicucci and another Board member said they read the e-mail.

165.    Ms. Jagoda then said that change happens at the top, which is why she was coming to the meeting. She discussed several incidents with Vucetovic, starting from the beginning, and told the Board that she had previously reported the incidents to four Board members.

166.    When Ms. Jagoda was finished speaking, Board President Maggio identified Attorney Glatthaar, who she did not recognize and was unaware was present. He started questioning Ms. Jagoda but, feeling blindsided, she did not answer. She also did not trust Attorney Glatthaar based on the belief of several unit owners that he misrepresented seeing Board President Maggio's name on the deed to his unit.

167.    Next, Jansen said she was present when Ari painted over the word "BITCH" on the pillar next to Ms. Jagoda's spot. Ms. Jagoda asked why she was not informed when it was done as she had requested. Jansen said it was because she had not read that part of Ms. Jagoda's e-mail. Jansen said that she personally went to the garage and watched Ari paint over it, but before he did, she felt the word with her finger. She said she was disturbed that someone expended the energy to scratch that into the pillar and she wanted to find out who did it.

168.    Ms. Jagoda then requested that a three-person committee be appointed to review complaints about Vucetovic's conduct going forward. Jansen said it was not possible but there was a harassment form that could be filled out on the Regatta's website.

169.    Ms. Jagoda then expressed her concern that, instead of conducting a proper investigation, Board President Maggio asked her harasser himself whether he did it and to check to the footage. In response, Board President Maggio claimed he was present when Vucetovic reviewed the footage, but that is inconsistent with: (i) the fact that he did not know the parking garage was empty that day (¶ 151); and (ii) the voicemail he left her on January 2 at 3:52 p.m. in which he said: "[Vucetovic] reviewed those tapes, call me when you get a chance."

170.    Next, Board President Maggio told Ms. Jagoda during their January 2, 2020 call that Vucetovic said there was a camera on her spot in the garage. But when they reviewed the footage during the meeting, Board President Maggio showed a very distant camera, and after Ms. Jagoda pushed him, he showed footage from a camera that was slightly closer but not a direct shot.

171.    At the meeting, Amicucci asked Ms. Jagoda: "What do you want?" She told him that she wants to live without being harassed anymore. Once again, her plea fell on deaf ears.

172.    Ms. Jagoda later learned (during a June 19, 2020 phone call with Board President Maggio) that, when she left the meeting, the Board concluded that Vucetovic "has a hot head but he would never do anything." Board President Maggio then told Ms. Jagoda that the Board dismissed CW2's issues with Vucetovic on the grounds that she "had a vendetta with him."

173.    Ms. Jagoda was also told that, without her consent, her complaint was forwarded to Vucetovic's union – giving Vucetovic yet another reason to retaliate against her.

174.    Later in January, Ms. Jagoda ran into Ari in the garage. He asked if she found out who wrote "BITCH" on the column. She said no, that she has a lot of problems in the Building and just wants to be left alone. He responded: "Let me know if you want me to give someone a good smack."

175.    On March 19, 2020 at 6:46 p.m., Ms. Jagoda emailed McGraw, Jansen, and Strino:

I hope you are staying safe and healthy during these uncertain times. I was sidetracked from completing my review of the parking garage footage by a bad case of the flu and the sudden illness and untimely passing of a family member who lived with my family. I plan to finish reviewing the footage in the coming days.

I recently complained about Alex and his grandchildren's loud presence outside my balcony in the Regatta courtyard around 7 in the evening, only to find Alex and his wife outside my balcony in the Regatta courtyard at 6:00 this evening. I assume he was spoken to about the first incident. Alex has quite often shown that he does not respect rules or boundaries, and I continue to live in fear of his whims.

I am e-mailing because most of the camera footage does not show the area near my car clearly. As an example, at one point in the footage, my neighbor walks near my car and his image then disappears from view because there isn't a clear view of my car. I am most fearful for my safety while in the parking garage, and would feel more comfortable/protected if I have a parking spot that is in clear view of/close to a parking garage security camera. Please do let me know what can be done to provide me with a parking space in clear view of a camera for my protection and safety and peace of mind.

176.    The following day, Jansen responded:

I have asked [Board President Maggio] to speak to [Vucetovic] again. I have also asked to have your request to move parking spots put on the Agenda for the next meeting which is next week.

177.    In late-March 2020, Ms. Jagoda left the Regatta to live with her parents because residents received a notice that a Regatta resident had COVID-19.

### *May – June 2020: RMR is Placed in Charge of Problems with Vucetovic,*
### *But Vucetovic Continues to Harass and Bully Ms. Jagoda and Violate House Rules*

178.    In late May 2020, CW2 told Ms. Jagoda that she saw Vucetovic's daughter or daughter-in-law with Vucetovic's grandchild. Neither were wearing masks in the lobby in violation of a Regatta house rule adopted to limit the spread of COVID-19. CW2 reported it but the Board said they did not see anything of that nature in the camera footage. CW2 had also reported that someone significantly damaged her mailbox but received the same response.

179.    In addition, during this time, packages that had been left in front of Ms. Jagoda's door were taken but she had not been notified. When Ms. Jagoda inquired about her packages, Board President Maggio informed her that Vucetovic had taken them. They were then returned.

180.    Also in May 2020, McGraw told Ms. Jagoda that (sometime earlier than May 2020) she had had a meeting with Board President Maggio and Woodlief, and they all agreed that Vucetovic "plays games" with people he has a problem with and that Woodlief would be in charge of handling problems with Vucetovic going forward.

181.     In early June 2020, Ms. Jagoda saw Board President Maggio. He told her there is a safety issue in the plaza and people are not permitted to be there. In addition, he said that anyone who is in the plaza must wear a hard hat because the Building had bricks fall down from the façade.

182.     Board President Maggio also said about Vucetovic: "It's hard to get someone to follow the rules when he's been doing what he wants for so long. Sometimes you have to … [*making a motion like he was kicking someone*]."

183.     Notably, the Board, Board President Maggio, and/or RMR are ready, willing and able to address other issues and enforce certain alleged violations of the By-Laws and/or House Rules. For example, CW1 received a letter and was fined when some type of liquid fell off of her balcony. CW1 also received a letter threatening to prohibit her from having a dog if it is not leashed. In addition, CW2 was disciplined for spilling paint on the floor of the parking garage. Further, a woman who lives on Ms. Jagoda's floor received a letter from the Board and/or RMR for leaving the trash bin door in the garage open. And on another occasion, a Unit owner was formally reprimanded by the Board and/or RMR for not wearing a mask in the common areas.

184.     On June 11, 2020, Ms. Jagoda emailed Board President Maggio, Jansen, McGraw, and Strino:

> I hope everyone on the Board is doing well amidst these difficult times. I'm just wondering what the outcome of [Board President Maggio's] talk with Alex was and what the Board's decision was about providing a parking spot closer to a camera on the [second] floor. I am under the understanding that the Board looks at Alex in a more favorable light given his help during the pandemic, but it is also important that the Board continue to remember and be responsive to Alex's history of skirting the rules and his run ins with women and minorities in this building. I have attached a picture from the closed off courtyard area today.

185.     On June 16, 2020, Woodlief emailed Ms. Jagoda and said:

> - the board will consider your request to be relocated to a space in the P1 garage close to a security camera at the June meeting. We will get back to you.
> - [Vucetovic] will be reminded the Plaza is closed and that no one should be there!

34

186.    On June 18, 2020, Ms. Jagoda sent the following email to Woodlief:

I heard there's a rule that people have to wear hard hats while in the courtyard. I was just sitting on my balcony at 1:20, and noticed [Vucetovic] was not wearing one. He put one on when he saw me, but his friend (perhaps his son) was hanging out there and did not wear one.

I feel very uncomfortable when [Vucetovic] is in the courtyard. I am simply asking that if he must be in the courtyard that he do so without bringing his family and friends there. The area is closed off to Regatta residents, and the rules should apply to him as well.

187.    Woodlief responded: "Thanks for the heads up I will speak with [Vucetovic]."

188.    That same day, Board President Maggio called Ms. Jagoda and said: "I feel like you're awkward with me now, you don't say hello, and you try to avoid me." He also dismissed her complaints: "The plaza issue is not a Regatta issue, it's an Anjoli issue."

189.    Board President Maggio then asked Ms. Jagoda not to copy McGraw or Woodlief on e-mails about Vucetovic, and that she should just send her complaints to him – despite the fact that Woodlief was now in charge of complaints about Vucetovic (¶ 180). Ms. Jagoda responded that in the past, she had gone to Board President Maggio for help but the harassment continued.

190.    Board President Maggio then made it clear that Vucetovic is indispensable and said: "What do you want me to do? Fire him and hire a Mexican who can't speak English?"

191.    Board President Maggio then said that "at this point" McGraw was the only one who had an issue with Vucetovic and it was only "because of her political beliefs."

192.    Board President Maggio then told Ms. Jagoda that she could get an electrician to install a camera over her parking spot. She said that she had seen Vucetovic change people's parking spots and didn't understand why they couldn't change hers for a safety issue. She told Board President Maggio there were open parking spots that aren't being used. He told her to send him and Woodlief an e-mail with the parking spot numbers.

193.    Board President Maggio ended the call by saying "[i]t's clear that we need to keep you and [Vucetovic] away from each other," which he knows is impossible.

194.    On June 20, 2020, Board President Maggio left Ms. Jagoda a voicemail saying he couldn't give her any of the open parking spots because parking spot numbers were in the deeds for owners' units. This statement was false as Vucetovic has reassigned parking spots, the By-Laws provide that assigned spaces are subject to change and changes can be made based on availability, and there is a waiting list to enable unit owners to change parking spots.

195.    On June 22, 2020 at 6:09 p.m., Ms. Jagoda was sitting on her balcony trying to relax and enjoy an early summer evening. Vucetovic was below in the courtyard. He stared Ms. Jagoda down, gave her nasty looks, and then gave her the middle finger. Ms. Jagoda was able to photograph Vucetovic in the act:



196.    Vucetovic saw Ms. Jagoda photographing him and yelled:

**"Did you get that? Send it to your mom and tell her to shove it up her ass!"**

197.    Ten minutes later, Ms. Jagoda sent an email to Woodlief, Jansen, Strino, and McGraw, attaching the photo and saying:

> I've attached a picture of [Vucetovic] flipping me off while I was sitting on my balcony. He said "did you get that? Send it to your mom and tell her to shove it up her ass."
>
> Please let me know what will be done about this. This man has threatened me before. It's only a matter of time before he does something that goes beyond words.
>
> I expect a reply by Friday, June 26 from someone on the Board who is not [Board President Maggio]. If not, I will pursue necessary measures to keep myself safe.

198.    At 7:25 p.m., McGraw responded to Ms. Jagoda's email by text message:

**"I saw your email. He is out of control …. My heart is pounding looking at that picture."**

199.    Ms. Jagoda went to the Mamaroneck Police Department to file a report about the incident. An officer informed her that Vucetovic "has a lot of friends in the Department" and, at that moment, a lot of them were inside the station.

200.    On June 24, 2020, Ms. Jagoda was sitting on her balcony at 1:35 p.m. Vucetovic stepped out into the courtyard. After Vucetovic made eye contact with Ms. Jagoda, she got up and went inside her apartment. As she was opening the sliding door to her apartment, Vucetovic, happy and proud to have bullied Ms. Jagoda off of her own balcony, yelled "thank you!" and started whistling loudly.

201.    On June 24, 2020, Ms. Jagoda forwarded her June 22, 2020 6:19 p.m. email (¶ 197) to Woodlief, Jansen, Strino, and McGraw and further stated the following:

> I was sitting on my balcony at 1:35 p.m. today, and [Vucetovic] came into the courtyard. We made eye contact and I immediately went into my apartment because of the numerous incidents that have occurred. While I was opening the sliding door to enter my apartment, he said "thank you!" and started whistling very loudly nonstop.

Today's events lead me to believe that the Board has not taken any action, despite my sending a picture of a building employee using a profane gesture toward me (an owner in the building) and despite my informing the Board that the employee was speaking profanely to me. I have noticed a wall of silence from the Board after I requested a parking space close to a camera because I am scared for my safety. Since the pandemic, the only person who has reached out or responded to me from the Board has been [Board President Maggio]. [Board President Maggio] has reached out on multiple occasions since I complained about [Vucetovic's] actions in January, which has made me feel uncomfortable because I have been trying to distance myself from his sphere of influence. I communicated this to [Board President Maggio] on June 19th when he called me to essentially tell me that Vucetovic is indispensable despite anything he does, and that my concerns are "an Anjoli issue." [Board President Maggio] has conveyed this sentiment from the very beginning of our conversations over a year ago, and the Board's silence leads me to believe that the Board agrees with [Board President Maggio].

I am requesting that a Board member (not [Board President Maggio]) contact me today to inform me what action was taken to address Vucetovic's inappropriate behavior on Monday. **I fear for my safety now more than ever, as I feel that the Board - who is supposed to hold Vucetovic accountable for inappropriate actions - has collectively given Vucetovic a free pass to harass and intimidate me**. [Emphasis added.]

202.    That day, Ms. Jagoda told McGraw that she was not comfortable visiting her parents in the evenings anymore, as it would require her to be in the garage at night when she returned. McGraw offered to have her son accompany Ms. Jagoda at night to make her feel safe.

203.    Ms. Jagoda also told McGraw that she trusted her but not the other members of the Board. She asked McGraw if the Board is going to actually investigate or if, whatever they do, will be superficial. McGraw said she hopes they're doing it in good faith. Ms. Jagoda then told McGraw that she does not trust Attorney Glatthaar who, according to an email Ms. Jagoda received from the Board, would be privy to anything she submitted concerning this matter.

204.    On June 24, 2020, Jansen emailed Ms. Jagoda, cc'ing Strino and McGraw:

Thank you for sharing with us your concerns about the conduct of the Regatta Building Superintendent Mr. Alex Vucetovic and for providing details in your June 22, 2020 email (and again today) about a number of recent incidents.

On behalf of the Regatta Condominium Board, we wish to reassure you that the Board is committed to maintaining a living environment that is free from harassment of any nature, especially as a result of employees' alleged misconduct. As fellow Regatta owners/residents, we are sensitive to the type of events described in your recent communication and will make all reasonable and lawful efforts within our authority to ensure that you as any owner/resident can enjoy her property rights without fear of harassment or retaliation.

In accordance with the Regatta's sexual harassment policy and the Condominium governing documents, the Board has initiated an investigation into the events described in your June 22, 2020 email. As you will appreciate, there are important procedures in place to safeguard the rights of all the persons involved and to guarantee a fair investigation into those serious allegations.

Moreover, due to the potentially sensitive nature of information shared during the upcoming fact-finding process, the Board understands that you - as the recipient of alleged unwelcome conduct - might be reluctant to share additional details. Thus, we encourage you to the be upfront in communicating to the Board any objection or discomfort this process might cause you so that the Board can propose ways to mitigate any stress or undue burden in the course of this investigation. At the same time, please recognize that certain details will likely be important, if not determinative, to accurately retrace the events in question.

At this time, the Board has appointed a Committee composed of three Board members to supervise an investigation into the alleged facts, i.e. Ms. Susan Jansen (myself), Ms. Bridget McGraw and Mr. Paolo A. Strino. Please note that these individuals are the recipients of your June 22, 2020 email (and of today's email), thus we feel confident that you have no objection on their ability to inquire further on the matter.

Note that the role of the Committee is not to take a decision on the matter, but to report its findings of fact to the Board for any further action.

Confidentiality

We will use our best efforts to treat this matter confidentially. At the same time, certain information will have to be shared with other individuals on a need-to-know basis, as circumstances dictate.

Current Status and Next Steps

As an interim measure, [RMR] has already informed Mr. Vucetovic to refrain from any interaction of any nature with you.

At this point, the Committee is hoping to obtain a more comprehensive statement of the facts surrounding the events described in your email.

Please let us know if you wish to participate in a telephone interview with members of the Committee or alternatively to submit a comprehensive statement in writing. Let us also know if you wish to name any witness available to confirm your description of the events.

Finally, please note that:
(1) If you believe that this is a police matter, you should contact the proper authorities without delay.
(2) If at any time you engage counsel to assist on this matter, let the Board know and we will request the Regatta Condominium lawyer to make appropriate arrangements for future communications.

Once the full Board has reached a decision on this matter, it will inform you of the outcome of this process.

Please know that your safety is of utmost concern to the Board and this matter will be handled with the attention that it deserves.

205.    On June 25, 2020, Ms. Jagoda responded to Jansen:

Thank you for taking the time to respond to my e-mail. I am wondering what the level of confidentiality will be if I provide a written statement of the incidents that occurred, as I will be revealing sensitive information about two members of the Board as well ([Board President Maggio and Amicucci]). I already worry about my safety because of the issues with [Vucetovic], and it will not help to be on the bad side of two other individuals as well. Is it at all possible to find some way to assign me a parking space that is in clear view of a camera in the parking garage? I have not gone home to visit my parents in the evening since the incident with [Vucetovic], as I am scared to be in the garage in the evening in case I run into [Vucetovic]. Once I provide a written statement, I will be worried about running into the other two members of the Board as well. I worry that life will become harder for me once I provide a statement that includes everything.

206.    That evening, Jansen responded to Ms. Jagoda:

Thank you for your response.

As indicated earlier, the information will be treated confidentially and it will be shared on a need-to-know basis only. However, at a minimum you should expect the Board to have access to a statement of all relevant facts in order to take an informed decision on the outstanding allegations.

For your comfort, in your statement, you might want to anonymize the name of other individuals that you do not wish to reveal, for example by referring to them as Board Member 1 and Board Member 2. In that case, their identities will not be revealed to the full Board.

At the same time, for the avoidance of any doubt, our current fact finding efforts are directed into your allegations related to the Board Superintendent, in line with your email complaint dated June 22. Details are important and we cannot direct you on what to include or not include. However, we cannot regulate speech in <u>private</u> interactions between individuals in the Regatta, whether they are Board members or not. To reassure you, we will propose that in the future the Board designate a person to discuss official Regatta business with you, and I will suggest that that person be Bridget.

With regard to the alternative parking accommodation, this is an ongoing request and outside of the scope of this investigation. Bridget and I will be in touch to schedule an appointment with you and the Regatta Management company to discuss the status of the request, our current efforts, and the available options.

We look forward to receiving your statement.

207.    The "Sexual Harassment Policy for the Regatta" that Jensen referenced in her June

24, 2020 email provides, among other things, the following (with emphasis added):

[T]he Regatta is committed to ensure – within the limit of its authority – that not just the employees but also the Regatta community at large (Unit owners, lawful occupants, etc.) are free from Sexual harassment resulting from employees misconduct.

* * *

Sexual harassment will not be tolerated. Any employee or individual covered by this policy who engages in sexual harassment or retaliation will be subject to remedial and/or disciplinary action (e.g., counseling, suspension, termination).

* * *

Retaliation Prohibition: No person covered by this Policy shall be subject to adverse action because the employee reports an incident of sexual harassment, provides information, or otherwise assists in any investigation of a sexual harassment complaint. The Regatta will not tolerate such retaliation against anyone who, in good faith, reports or provides information about suspected sexual harassment. Any employee of The Regatta who retaliates against anyone involved in a sexual harassment investigation will be subjected to disciplinary action, up to and including termination.

* * *

Sexual harassment is offensive, is a violation of our policies, is unlawful, and may subject The Regatta to liability for harm to targets of sexual harassment. Harassers may also be individually subject to liability. Employees of every level who engage in sexual harassment, including managers and supervisors who engage in sexual harassment or who allow such behavior to continue, will be penalized for such misconduct.

* * *

While the process may vary from case to case, investigations should be done in accordance with the following steps:

Upon receipt of complaint, a designated representative of the Regatta Board of Managers, will conduct an immediate review of the allegations, and take any interim actions (e.g., instructing the respondent to refrain from communications with the complainant), as appropriate. **If complaint is verbal, encourage the individual to complete the "Complaint Form" in writing. If he or she refuses, prepare a Complaint Form based on the verbal reporting.** In the event that a designated representative of the Regatta Board of Managers is temporarily unavailable to receive such complaint, the complaint may be directed to the Management Company. If the allegation of sexual harassment is against the Management Company, the complaint may be directed to the Board's President.

208.    The Board's and RMR's well-documented apathy and inaction over the course of years concerning Vucetovic's sexual harassment of and retaliation against Ms. Jagoda and other women – including their failure to enforce the Regatta's so-called "sexual harassment policy" – speak far louder than the hollow words in Jansen's emails in which she, on behalf of the Board, makes commitments that the Board knows it will never fulfill.

209.    In the meantime, the Board, Board President Maggio, and RMR continue to act concerning other issues (¶ 183).

210.    For example, in a memo to Regatta owners and residents ("The Regatta Mainsheet") dated September 10, 2020, the Board reported, among other things:

**Pets** There have been numerous incidents, **some caught on video**, of pets defecating or urinating in the common areas. In the event of a pet accident, owners should immediately clean the mess. **Repeat offenders will face sanctions by the Board.** Aside from being unpleasant, dealing with pet issues takes the building staff away from their regular duties and requires Board time. [Emphasis added.]

211.    Instead of acting to stop "repeat offender" Vucetovic from sexually harassing and bullying women, the Board, Board President Maggio, and RMR focus their time and resources on monitoring the security cameras to catch, and sanction, owners with "pet issues."

**October 2020: Despite Jansen's Assurance That RMR Instructed Vucetovic to Refrain from Interacting with Ms. Jagoda, the Harassment and Bullying Persists**

212.    On October 1, 2020, Ms. Jagoda sent an email to Woodlief, McGraw, Jansen, and Board President Maggio reporting yet another incident with Vucetovic:

> At approximately 11:20 a.m. today, I was in the parking garage. [Vucetovic's] car and my car were passing each other, and my driver's side and his driver's side aligned for approximately 5-10 seconds. While our driver's sides were aligned and both of our windows were opened, [Vucetovic] stared me down in an intimidating fashion and said something in his native language in a tone that conveyed it was derogatory.

> I don't know why [Vucetovic] continues to harass and intimidate me. This hostility, to which I have been subjected to in the place that I call home, has been going on for almost two years. Throughout that time, I have notified you of the harassment and intimidation and pleaded for you to instruct Alex to leave me alone, but nothing has changed. I ask, once again, that you do so.

213.    To date, no one has responded to Ms. Jagoda's email or taken any action.

214.    As alleged above, the Board, Board President Maggio, and RMR, upon receiving notice of Vucetovic's and Calderon's unlawful conduct, had, and continue to have, the power, obligation, and duty to investigate, intervene, and take prompt and effective remedial action concerning their employees, Vucetovic and Calderon, including, without limitation, discipline and termination of employment, to protect Plaintiff from their unlawful conduct.

215.    The Board's, Board President Maggio's, and RMR's toleration and/or facilitation of Vucetovic's and Calderon's unlawful conduct interfered, and continues to interfere, with Plaintiff's use and enjoyment of her home, and created a hostile housing environment in violation of federal and state law.

216.    Defendants' unlawful conduct dramatically interfered with Ms. Jagoda's full use and enjoyment of her home. Because of Defendants' unlawful conduct, Ms. Jagoda has suffered and to this day continues to suffer humiliation, embarrassment, and emotional distress, and lives in a constant state of anxiety. She has lost sleep and can no longer sit on her balcony or leave her apartment to do simple things – like check the mail, go to the parking garage, pharmacy or grocery store, or enjoy the lifestyle that attracted her to the Regatta (¶¶ 9-10) – without fear of encountering Vucetovic or Calderon. She has installed a Ring™ doorbell camera for additional security.

**FIRST CAUSE OF ACTION**
**(Violation of Title VIII of Civil Rights Act of 1968 – Fair Housing Act)**
**(42 U.S.C. § 3604)**
**(Against All Defendants)**

217.    Plaintiff repeats and realleges each allegation above as if fully set forth herein.

218.    The FHA makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

219.    Sexual harassment is a form of sex discrimination that is prohibited by, and actionable under, the FHA.

220.    Plaintiff is a member of a protected group who has been subject to and endured unlawful and discriminatory conduct based on sex, including unwelcomed sexual harassment.

221.    The unlawful and discriminatory conduct has been so severe or pervasive as to interfere with or deprive Plaintiff of her right to use or enjoy her home and create a hostile housing environment in violation of her rights as protected by the FHA.

222.    The Board, Board President Maggio, and RMR knew or should have known of the unlawful and discriminatory conduct and took ineffectual or no action to protect Plaintiff and thereby tolerated and facilitated the unlawful and discriminatory conduct.

223.   The unlawful and discriminatory conduct, and the Board's, Board President Maggio's and RMR's tolerance and/or facilitation of such conduct, demonstrate a willful and gross disregard for Plaintiff's known rights.

**SECOND CAUSE OF ACTION**
**(Violation of Title VIII of Civil Rights Act of 1968 – Fair Housing Act)**
**(42 U.S.C. § 3617)**
**(Against All Defendants)**

224.   Plaintiff repeats and realleges each allegation above as if fully set forth herein.

225.   Plaintiff is a member of a protected group.

226.   By their alleged conduct, Defendants coerced, intimidated, threatened, or interfered with Plaintiff in her exercise or enjoyment of, or on account of her having exercised or enjoyed, or on account of her having aided or encouraged any other person in the exercise or enjoyment of, her right guaranteed by Section 3604 to use and enjoy her home free from unlawful and discriminatory conduct based on sex, including unwelcomed sexual harassment.

227.   In addition, Section 3617 prohibits retaliation against a person who, *inter alia*, asserted her rights under the FHA or reported unlawful discriminatory housing practices.

228.   Plaintiff engaged in protected activity by opposing prohibited conduct. Defendants were aware of the protected activity and subsequently took adverse action against Plaintiff. There is a causal connection between the protected activity and the adverse action.

229.   Vucetovic's and Calderon's actions and the Board's, Board President Maggio's, and RMR's actions and failure to act demonstrate a willful and gross disregard for Plaintiff's known rights.

**THIRD CAUSE OF ACTION**
**(Violation of the N.Y.S. Human Rights Law – N.Y. Exec. Law § 296(5)-(6))**
**(Against All Defendants)**

230.   Plaintiff repeats and realleges each allegation above as if fully set forth herein.

45

231.   Under Section 296(5)(a)(2), it is an unlawful discriminatory practice to discriminate against any person on the basis of, *inter alia*, sex, in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith.

232.   Sexual harassment is a form of sex discrimination that is prohibited by, and actionable under, the NYHRL.

233.   Plaintiff is a member of a protected group who has been subject to and endured unlawful and discriminatory conduct based on sex, including unwelcomed sexual harassment.

234.   The unlawful and discriminatory conduct has been so severe or pervasive as to interfere with or deprive Plaintiff of her right to use or enjoy her home and create a hostile housing environment in violation of her rights as protected by the NYHRL.

235.   The Board, Board President Maggio, and RMR knew or should have known of the unlawful and discriminatory conduct and took ineffectual or no action to protect Plaintiff and thereby tolerated and facilitated the unlawful and discriminatory conduct.

236.   The unlawful and discriminatory conduct, and the Board's, Board President Maggio's and RMR's tolerance and/or facilitation of such conduct, demonstrate a willful and gross disregard for Plaintiff's known rights.

237.   In addition, under Section 296(6), it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under the NYSHRL, or to attempt to do so.

238.   In the alternative, Defendants aided and abetted unlawful and discriminatory conduct on the basis of sex. The unlawful and discriminatory conduct alleged demonstrates a willful and gross disregard for Plaintiff's known rights.

## FOURTH CAUSE OF ACTION
### (Violation of the N.Y.S. Human Rights Law – N.Y. Exec. Law §§ 296(7))
### (Against All Defendants)

239.     Plaintiff repeats and realleges each allegation above as if fully set forth herein.

240.     Under Section 296(7), it shall be an unlawful discriminatory practice for any person engaged in any activity to which the NYSHRL applies to retaliate or discriminate against any person because she has opposed any practices forbidden under the NYSHRL or because she has filed a complaint, testified or assisted in any proceeding under the NYSHRL.

241.     Plaintiff engaged in protected activity by opposing prohibited conduct. Defendants were aware of the protected activity and subsequently took adverse action against Plaintiff. There is a causal connection between the protected activity and the adverse action.

242.     Vucetovic's and Calderon's actions and the Board's, Board President Maggio's, and RMR's actions and failure to act demonstrate a willful and gross disregard for Plaintiff's known rights.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)
### (Against the Board, Board President Maggio, and RMR)

243.     Plaintiff repeats and realleges each allegation above as if fully set forth herein.

244.     The Board, Board President Maggio, and RMR owe Plaintiff a fiduciary duty.

245.     As alleged, the Board, Board President Maggio, and RMR breached their fiduciary duty to Plaintiff. As a result of their breach, Plaintiff has suffered damages.

246.     In addition, in the alternative with respect to RMR, RMR aided and abetted the Board's and Board President Maggio's breach of fiduciary duty.

247.    RMR knowingly induced or participated in the Board's and Board President Maggio's breach and provided substantial assistance to the Board and Board President Maggio. As a result, Plaintiff has suffered damages.

### SIXTH CAUSE OF ACTION
#### (Negligent Supervision and Retention Under New York Law)
#### (Against the Board, Board President Maggio, and RMR)

248.    Plaintiff repeats and realleges each allegation above as if fully set forth herein.

249.    The Board, RMR, and Board President Maggio knew or should have known that certain agents and/or employees, including Vucetovic, have a propensity to engage in the type of misconduct alleged that caused Plaintiff to suffer injury. Thus, the Board, RMR, and Board President Maggio had a duty to supervise such agents and/or employees.

250.    The Board, RMR, and Board President Maggio failed to supervise certain agents and/or employees, including Vucetovic, whom they had a duty to supervise.

251.    The Board, RMR, and Board President Maggio further breached their duty of care by failing to take adequate corrective measures when they were informed that Plaintiff was being subjected to the alleged unlawful conduct by certain agents and/or employees, including Vucetovic, whom they had a duty to supervise.

252.    As a direct and proximate cause of the Board's, RMR's, and Board President Maggio's negligent supervision and retention, Plaintiff has suffered and continues to suffer injury.

### SEVENTH CAUSE OF ACTION
#### (Intentional Infliction of Emotional Distress)
#### (Against Vucetovic)

253.    Plaintiff repeats and realleges each allegation above as if fully set forth herein.

254.    Vucetovic has engaged in extreme and outrageous conduct, including, *inter alia*, a deliberate and malicious campaign of harassment and intimidation directed at Plaintiff, with an intent to cause, or in disregard of a substantial probability of causing, severe emotional distress.

255.    Vucetovic's extreme and outrageous conduct directed at Plaintiff has caused Plaintiff to suffer severe emotional distress.

<h3 style="text-align:center;"><u>PRAYER FOR RELIEF</u></h3>

WHEREFORE, Plaintiff prays for judgment and relief as follows:

(a)    Enjoining Defendants from engaging in the unlawful acts and practices alleged;

(b)    Awarding Plaintiff compensatory damages;

(c)    Awarding Plaintiff punitive damages;

(d)    Awarding Plaintiff's counsel's reasonable attorney's fees and costs; and

(h)    Granting such other and further relief as the Court deems appropriate.

Dated:  White Plains, NY
        October 19, 2020

**LACHTMAN COHEN P.C.**

Brian S. Cohen
bcohen@lcpclaw.com
Lia E. Fierro
lfierro@lcpclaw.com
245 Main Street, Suite 230
White Plains, NY 10601
Telephone: (914) 893-4720
**Attorneys for Plaintiff**